## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

8:24mc412

FEDERAL TRADE COMMISSION,

    Plaintiff,

    v.

EMPIRE HOLDINGS GROUP LLC, also d/b/a
ECOMMERCE EMPIRE BUILDERS and
STOREFUNNELS.NET, a limited liability
company, and

PETER PRUSINOWSKI, aka PETER PRU,
individually and as an officer of Empire Holdings
Group LLC,

    Defendants.

Case No. ___24-CV-4949___

**COMPLAINT FOR PERMANENT
INJUNCTION, MONETARY
JUDGMENT, AND OTHER RELIEF**

                                                                                    

    Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint

alleges:

    1.    The FTC brings this action for Defendants' violations of Section 5(a) of the FTC

Act, 15 U.S.C. § 45(a); the FTC's Trade Regulation Rule entitled "Disclosure Requirements and

Prohibitions Concerning Business Opportunities" ("Business Opportunity Rule" or "Rule") 16

C.F.R. Part 437, as amended; and the Consumer Review Fairness Act ("CRFA"), 15 U.S.C. §

45b. For these violations, the FTC seeks relief, including a temporary, preliminary, and

permanent injunction, monetary relief, and other relief, pursuant to Sections 13(b), and 19 of the

FTC Act, 15 U.S.C. §§ 53(b), 57b; the Business Opportunity Rule; and the CRFA.

## SUMMARY OF THE CASE

    2.    Defendants deceptively market and sell ecommerce business opportunities and

self-study programs by falsely claiming that consumers will generate substantial income from

online stores that are "powered by artificial intelligence" and Defendants' "proven" strategies.

Defendants falsely promise that consumers will quickly earn $10,000 per month—and could

1

even make millions of dollars. In truth, the promised profits never materialize, and Defendants

enrich themselves while leaving their clients with failed businesses that generate little, if any,

profit. Defendants' income representations about their business opportunities and self-study

programs are false or unsubstantiated.

3.      When selling their business opportunities, Defendants use non-disparagement

clauses in their form contracts that prohibit virtually all communications or statements about

Defendants, which violate the Consumer Review Fairness Act. Defendants also fail to provide

required statements and disclosure documents when selling their business opportunities, as

required by the Business Opportunity Rule.

4.      Since 2021, Defendants have deceived consumers out of at least $14.3 million.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a),

and 1345.

6.      Venue is proper in this District under 28 U.S.C. § 1391 (b)(1), (b)(2), (c)(2), and

(d), and 15 U.S.C. § 53(b).

## PLAINTIFF

7.      The FTC is an independent agency of the United States Government created by

the FTC Act, which authorizes the FTC to commence this district court civil action by its own

attorneys. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act,

15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

The FTC also enforces the Business Opportunity Rule, 16 C.F.R. Part 437, as amended, which

requires sellers to provide disclosure documents and prohibits false or unsubstantiated earnings

claims. The FTC also enforces the CRFA, 15 U.S.C. § 45b(a)(2), which prohibits standardized

provisions that threaten or penalize people for posting honest reviews.

2

**DEFENDANTS**

8.     Defendant Empire Holdings Group LLC, also doing business as Ecommerce Empire Builders and Storefunnels.net, ("EEB") is a Wyoming limited liability company incorporated in 2018, with its principal place of business at 2370 York Rd., Jamison, Pennsylvania 18929. EEB transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, EEB has advertised, marketed, distributed, or sold self-study programs and business opportunities to consumers throughout the United States.

9.     Defendant Peter Prusinowski, also known as Peter Pru, is the Chief Executive Officer and sole owner of EEB. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of EEB, including the acts and practices described in this Complaint. Prusinowski is the public face of EEB, features prominently in the deceptive advertising for EEB's self-study programs and business opportunities, and appears often in its self-study program videos explaining EEB's purported ecommerce strategies. Prusinowski also opened and controls corporate bank accounts and web domains, signed consumer contracts containing non-disparagement clauses on behalf of EEB, and often directs consumers to contact him using his EEB email address. Prusinowski resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

**COMMERCE**

10.     At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

3

## DEFENDANTS' BUSINESS ACTIVITIES

11.     Since at least 2021, and continuing through the present, Defendants have been marketing business opportunities and also online self-study programs to consumers in this country and abroad through the internet, email, and social media platforms like Facebook, Instagram, TikTok, and YouTube.

12.     In both their self-study and business opportunity programs, Defendants promote a "dropshipping" business model. In the dropshipping model, an online store is created and offers products without keeping them in stock. When a shopper purchases the product from the online store, the product is then ordered from a third-party and shipped directly to the shopper. Defendants instruct clients to find cheap products from Chinese dropshipping companies and then market and sell them to shoppers at a higher price through the stores Defendants build for their clients.

### *Deceptive Advertising and Marketing of Defendants' Business Opportunities*

13.     Defendants market their business opportunities as "Done For You Services," "Business In A Box" and as their "Platinum Program." According to Defendants, these business opportunities are powered by artificial intelligence, and built and launched by Defendants' "seven figure" or "eight figure" team. Defendants claim that—in as little as thirty days— Defendants will "build and launch" a client's "very own cash-flowing online business" that is "a proven, secure and scalable system that's inflation resistant and has BIG tax advantages." Defendants promise to provide a "secondary income stream that's 90% hands off."

14.     In their marketing, Defendants assert that their business opportunities will allow clients to "Skip the guesswork and start a million-dollar business today" by harnessing the "power of artificial intelligence" and Defendants' strategies. Defendants frequently claim that their clients will make $10,000 a month in income and even millions of dollars.

4

15.     The cost of these business opportunities has changed over time. For example,
Defendants have offered their business opportunities at different price points ranging between
$10,000 and $35,000 over the course of their scheme.

16.     Defendants advertise and market their business opportunities online, including
through Facebook, Instagram, TikTok, YouTube, and on the EEB's website,
ecommercempirebuilders.com. Defendants' Facebook advertisements are posted from
Prusinowski's account. Consumers who come across these advertisements see posts with
headings like "Get An AI-Powered Ecom Store Built and Launched For You By Our 7-Fig
Team."

17.     The Facebook advertisements frequently include videos making similar claims,
and Prusinowski is the main speaker in these advertisements. For example, a Facebook
advertisement posted by Prusinowski on December 6, 2023, advertises "An E-commerce
Business Built and Launched By Our Team." In the video accompanying the advertisement,
Prusinowski claims to have launched three online businesses in one week, which were already
selling products and making money on their first day. Prusinowski explains how he
accomplished this by finding hobbies listed on Wikipedia, reviewing bestselling items related to
those hobbies on Amazon, and then finding and selling similar products related to those hobbies
from foreign dropshipping companies like AliExpress and CJdropshipping. In this advertisement
and throughout the entire video, a static screenshot shows notes with various earnings claims
next to Prusinowksi while he is talking. As seen in the image below, in those notes, Defendants
claim they will provide clients with a "10k/mo Ecom Store Built and Launched by our team."
Defendants also claim that they have already built "57 $10k/mo stores," "34 $50k/mo stores,"
and "6 $1M+ per year stores," and Defendants claim they will complete all the necessary steps to
provide clients with a "fully functional store."

5



18.     Defendants also advertise and market their business opportunities on Instagram and TikTok. Defendants' Instagram account, ecommerce.empire.builders, has 4,043 posts and 118,000 followers, and drives consumer traffic to their website. Defendants' TikTok account, @ecomm.empire.builders has 1,454 followers and 12,500 likes. Both profiles' descriptions contain claims about building "AI-Powered" ecommerce businesses, and at the top of their Instagram profile is a link to their website next to an emoji of a flying stack of money.

19.     As seen in the images below, Defendants' Instagram and TikTok posts also tout earnings claims. For example, in one Instagram post, Prusinowski claims that consumers will be able to "copy and paste a million-dollar ecommerce business in seven easy steps," while an image that contains the phrase "$17,269,718.29 in total sales" floats behind his head. Similarly, in a TikTok post Defendants tell consumers "Skip the guesswork and start a million-dollar business today," while Prusinowski claims that starting "$1,000,000 Online Businesses Are Simple" using Defendants' strategy. The thumbnail for this TikTok post also displays Prusinowski claiming consumers only need one winning product to get started while an image

6

that says "$93.17k" floats above his head. Prusinowski closes out the advertisement by telling

interested consumers to "Comment '100k' down below" so they can start using his "seven figure

funnel template to start selling winning products today."



***Defendants' Use of Deceptive Business Opportunity Testimonials***

20.     Throughout Defendants' advertising and marketing, and on their websites,

Defendants use deceptive testimonials from purportedly successful clients of Defendants'

business opportunities. These testimonials often claim that clients are making thousands to tens

of thousands of dollars every month from the ecommerce stores Defendants built for them. For

example, some of these testimonials claim:

- "Selina Made $10,000 In Her Second Month With Our Ecommerce Platinum
  Program!" and Selina made "Her FIRST $10k With One Product Dropshipping!"

- "Natalia Made $10,000 In Her First Month With Our Ecommerce Platinum Program!" and Natalia made "10k Selling 1 Product"

- "Quanq Made $40,000 In Three Months With Our Ecommerce Platinum Program!" and Quanq went from "$0 to $40,000+ In ONLY 3 Months With Droppshipping Sales Funnels!"

- "Justin & Lindsay Made $12,000 In 12 Days With Their DFY Ecommerce Business"

### *Defendants' Free Training For Interested Consumers*

21.     Defendants' advertisements on Facebook, Instagram, and TikTok frequently include links for interested consumers to watch a free training video. Consumers who click on the links for Defendants' free "training" are directed to Defendants' website, where they are instructed to watch a twenty-minute video. This video features Prusinowski and contains similar claims to the ones Defendants use in their social media advertising. In the video, Prusinowski holds himself out as the CEO of EEB and tells prospective clients that he is going to teach them exactly what building their AI-powered ecommerce store and funnels in the next thirty days entails.

22.     While narrating the video, Prusinowski makes numerous earnings claims and uses deceptive testimonials. For example, within minutes of starting the free "training" video Defendants display screenshots of sales figures from allegedly successful clients of Defendants' business opportunities. Prusinowski claims many of the purported clients of Defendants' business opportunities are in Defendants' $10,000 a month club or $50,000 a month club, with some clients now making hundreds of thousands to millions of dollars.

23.     Prusinowski further explains who Defendants' business opportunities are for. Prusinowski claims that their business opportunities are for people working nine to five jobs that want to start making money online, existing ecommerce business owners who aren't making

8

enough money, people struggling to get their ecommerce businesses to work and make

predictable money, or anyone who has felt overwhelmed or previously tried to start an online

business and got no results. Further, Prusinowski claims that Defendants' business opportunities

are for anyone who wants to capitalize on AI, as seen in the image below.



24.    According to Prusinowski, EEB clients were able to optimize their ecommerce

stores and increase their revenues. With Defendants' funnels, Prusinowski claims that clients of

Defendants' business opportunities could see revenues as high as $31,910.00 per 1,000

customers, and $29,964 per year from only 100 monthly subscribers.

25.    In the free "training" video, Prusinowski continues to claim the businesses EEB

builds for consumers are "powered by artificial intelligence to make your life easier."

Prusinowski claims artificial intelligence has already been added into their store funnels and

consumers will be able to use it to "write[] copy, advertisements, emails, blog posts, articles,

customer service, etc." Prusinowski claims that aspects of a business that used to cost tens of

9

thousands of dollars are now all built into Defendants' programs with AI, saving clients money and increasing their profits.

26.    At the end of Defendants' free "training" video, Prusinowski instructs consumers to click a hyperlink at the bottom of the webpage and fill out an application to qualify for Defendants' business opportunities. Before consumers reach the hyperlink, they must scroll through numerous additional false or unsubstantiated earnings claims, testimonials, and screenshots of purported profits from clients of Defendants' business opportunities. Once consumers click on the hyperlink to apply, they are brought to an online questionnaire that asks consumers for information about themselves, and other information about the sorts of outcomes they would like to achieve from using Defendants' business opportunities, in addition to how much money consumers are able to invest. Defendants then schedule a call with consumers to discuss in more detail.

*Phone Calls With Defendants' Representatives*

27.    During the scheduled calls, Defendants' representatives make additional false or unsubstantiated claims. Defendants' representatives explain how Defendants use dropshipping and discuss some of the different fees that will need to be paid after purchase. Defendants' representatives claim that Defendants will build the entire business for clients, do "all the product selection, 100 percent for you," and ensure clients' businesses are selling products within a month. Defendants offer prospective clients an automated ad management service and other packages that will purportedly help clients oversee marketing, use artificial intelligence, and have virtual assistants run all of the businesses' customer support. Defendants' representatives also claim that after they build the business for clients, clients will have access to "unlimited one-on-one calls with our team Monday through Friday where our team helps you through any question literally step-by-step."

10

28.     Defendants' representatives also discuss potential profits and other aspects of their businesses with prospective clients on these calls. Defendants' representatives talk about how consumers will bring in profits within thirty days of Defendants' building clients' businesses, and that clients' businesses will only take five to ten hours of work per week to run. Defendants' representatives claim that their profit margin goals are "30/40 percent profit" and "50 to 80 percent profit," and when discussing if it would be possible to make around $60,000 a year they stated, "it's definitely, definitely would be feasible . . . we have a hundred-plus people in the 100K club . . . that'd be over 10, 10k per month."

29.     After the calls conclude, Defendants then often send the prospective clients example funnels and their form contracts for their business opportunities.

30.     Consumers who purchase Defendants' business opportunities typically pay between $10,000 and $35,000. Prusinowski frequently signs Defendants' contracts as CEO of EEB, and Defendants require consumers to sign the contracts before they provide any of their business opportunity services.

### *Deceptive Advertising and Marketing of Defendants' Self-Study Programs*

31.     Defendants' self-study program (aka "Ecommerce Empire Academy") purports to provide instructional videos that teach clients everything that they need to know to create and implement their own online ecommerce stores, which Defendants claim will quickly start making thousands of dollars selling products online. The self-study program offers the same business strategies as the business opportunity program, except that the client is required to build the online store and business on their own. The self-study program typically costs between $997 and $1997.

32.     On Defendants' website, EEB purports to describe "Pete's flagship course that will teach you how to run an ultra-profitable eCommerce business using sales funnels and

11

scaling to high 6 & 7 figures!" and on another webpage claims "No Matter if it's an Extra $1000 a Month OR a 6-Figure Online Income, Ecommerce Empire Academy is YOUR FASTEST Path!" to success. Defendants claim that the Ecommerce Empire Academy is a proven system that can help people of all skill levels get "on the road to **replacing your full-time income**."

33.    Consumers who purchase the Ecommerce Empire Academy are given a self-study program that is more resource-intensive and complex than Defendants represented prior to purchase. The self-study program takes many hours to review, and clients also need to spend significant amounts of time and effort implementing the strategies and instructions explained. Even after clients establish their own ecommerce store and funnels, it will be resource intensive for them to maintain. If they're actually able to do so, any income is uncertain, and the level of sales and revenues advertised on Defendants' website is far from likely.

### *Earnings Claims for Defendants' Business Opportunities and Self-Study Programs Are False or Unsubstantiated*

34.    The claims made by Defendants, and highlighted in their testimonials, are false or unsubstantiated. In truth, the results described in Defendants' advertising and marketing are far from typical, and Defendants' representations that consumers are likely to make substantial income have no reasonable basis.

35.    By their own admission, Defendants lack substantiation for their earnings claims that their business opportunities or self-study programs typically make thousands of dollars per month in additional income.

36.    Hidden at the bottom of one webpage Defendants state:

DISCLAIMER: The sales figures stated above are my personal sales figures. Please understand my results are not typical. I'm using these references for example purposes only. Your results will vary and depend on many factors…including but not limited to background, experience, and work ethic. All business entails risk as well as massive and consistent effort and action. If you're not willing to accept that, please DO NOT register for this webinar.

12

37.    This admission is neither clear nor conspicuous. To find this admission,
consumers must scroll through numerous additional earnings claims and screenshots of
purported profits and testimonials. This statement is also written in small light grey font, set
against a black background.

38.    Defendants also admit elsewhere that the results described are not typical.
Defendants state: "All businesses have inherent risk. Results not typical, results may vary. We
cannot guarantee these results as they are dependent on the client's ability and desire to grow
their business."

39.    Defendants' admissions directly contradict the earnings claims used by
Defendants. Moreover, these statements do not cure the impression created by Defendants' use
of deceptive earnings claims and testimonials—that clients of Defendants' business opportunities
and self-study programs are likely to earn substantial income from their ecommerce stores.

40.    Aside from EEB's admission that it lacks substantiation, its business model,
strategies, and tactics cannot guarantee the massive amount of income that EEB promises. After
purchasing Defendants' business opportunities and self-study programs, clients generally
discover that Defendants' claims of significant profit with little time and effort were d.

41.    Defendants understate the actual costs required to run and maintain a
dropshipping business, especially ongoing marketing costs. After accounting for fixed costs
needed to run and maintain EEB-built ecommerce stores, Defendants' online stores often lose
money—even the stores Defendants tout as success stories.

42.    EEB's business strategies and tactics are much more complex and labor-intensive
than described in Defendants' marketing before consumers paid EEB. Clients also report lack of
communication from Defendants and poor explanations for underperforming stores.

43.    Numerous clients' stores have not generated sales close to what Defendants

13

claimed, and clients have lost additional money over time attempting to maintain their stores.

Clients are forced to pay previously undisclosed recurring fees—which further decreases any

revenue they might otherwise realize.

44.     When clients seek refunds, or initiate chargebacks against Defendants,

Defendants challenge them. Defendants require clients who request refunds to first prove to

Defendants that they took specific steps to implement their services, and often do not refund

consumers or only refund them partially.

## Defendants' Contracts and Lack of Disclosure Documents

45.     Defendants require that clients sign a form contract for their business

opportunities. Defendants' form contracts contain the following non-disparagement clause:

> Each Party agrees for itself and all others acting on its behalf, either directly or
> indirectly: (i) Not to publish, repeat, utter and/or report any statement or
> observation, nor to take, encourage, induce or voluntarily participate in any
> conduct or action, that would negatively comment and/or reflect on, disparage,
> defame, impugn and/or call into question any other Party and/or any other Party's
> business operations, policies, practices and/or conduct or that of its directors,
> officers, members, shareholders, agents, employees, and/or affiliates; (ii) Not to
> act in any way with respect to any other Party's business operations, practices,
> policies and/or conduct that would impugn and/or damage any other Party's
> reputation, business relationships or present or future business, or the reputation
> of any other Party's past or present directors, officers, members, executives,
> shareholders, agents, employees or affiliates; and (iii) Not to comment about any
> other Party to any person or entity, including, but not limited to, the press (in any
> medium or format) or any other Party's customers and/or vendors concerning any
> Party's business operations, policies or conduct and/or actions. All Parties
> acknowledge that this provision is a material term of this Agreement, the violation
> of which shall be deemed a material breach hereunder.

46.     This non-disparagement clause prohibits or restrict clients' ability to write and

post truthful reviews of their negative experiences with Defendants' services.

47.     Defendants also fail to provide prospective clients with a disclosure document

substantiating the earnings and profit claims that the companies made: (1) in their advertising

and marketing; (2) in materials provided to prospective clients; or (3) by representatives

14

communicating with the prospective clients. Further, Defendants fail to provide prospective clients with a list of customers and contact information of individuals who purchased their business opportunities within the last three years.

48.    Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission because, among other things: Defendants engaged in their unlawful acts or practices over a period of at least three years, Defendants engage in their unlawful practices knowingly, Defendants continued their unlawful acts or practices despite knowledge of numerous complaints, and Defendants earned at least $14.3 million from participating in these unlawful acts or practices.

## VIOLATIONS OF THE FTC ACT

49.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

50.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## COUNT I

### Deceptive Earnings Claims

51.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of Defendants' business opportunities and self-study programs, Defendants represent, directly or indirectly, expressly or by implication, that purchasers of Defendants' business opportunities and self-study programs are likely to earn substantial income.

52.    Defendants' representations as described in paragraph 49 are false or misleading or were not substantiated at the time the representations were made.

53.    Therefore, Defendants' representations as described in paragraph 49 constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## **VIOLATIONS OF THE BUSINESS OPPORTUNITY RULE**

54.      The amended Business Opportunity Rule, 16 C.F.R. Part 437, which was

extended in scope to cover certain work-at-home opportunities, became effective on March 1,

2012, and has since that date remained in full force and effect.

55.      Defendants are "sellers" who, as described in paragraphs 11 to 46, have sold or

offered to sell "business opportunities" as defined by the Business Opportunity Rule, 16 C.F.R. §

437.1(c) and (q). Under the Business Opportunity Rule, a "seller" is a person who offers for sale

or sells a business opportunity. 16 C.F.R. § 437.1(q). Under the Rule, a "business opportunity"

means a "commercial arrangement" in which a "seller solicits a prospective purchaser to enter

into a new business"; the "prospective purchaser makes a required payment"; and the "seller,

expressly or by implication, orally or in writing, represents that the seller or one or more

designated persons will…[p]rovide outlets, accounts, or customers, including, but not limited to,

Internet outlets, accounts, or customers, for the purchaser's goods or services[.]" 16 C.F.R. §

437.1(c).

56.      Among other things, the Business Opportunity Rule requires sellers to provide

prospective purchasers with a disclosure document in the form and using the language set forth

in the Business Opportunity Rule and its Appendix A, and any required attachments. In the

disclosure document, the seller must disclose to prospective purchasers five categories of

information, including: basic identifying information about the seller, any earnings claims the

seller makes, the seller's litigation history, any cancellation and refund policy the seller offers,

and contact information of prior purchasers. 16 C.F.R. § 437.3(a)(1)-(5). Furthermore, this

information must be disclosed at least (7) days before the prospective purchaser signs a contract

or makes a payment. 16 C.F.R. § 437.2. The pre-sale disclosure of this information enables a

prospective purchaser to contract prior purchasers and take other steps to assess the potential

16

risks involved in the purchase of the business opportunity.

57.     Defendants, as described in paragraphs 13 to 30, have made earnings claims in connection with the sale of their business opportunities, as defined by the Business Opportunity Rule, 16 C.F.R. § 437.1(f). Under the Business Opportunity Rule, an "earnings claim" means "any oral, written, or visual representation to a prospective purchaser that conveys, expressly or by implication, a specific level or range of actual potential sales, or gross or net income or profits." 16 C.F.R. § 437.1(f).

58.     The Business Opportunity Rule prohibits sellers from making earnings claims unless the seller: (1) has a reasonable basis for the claim at the time it is made; (2) has in its possession written materials to substantiate the claim at the time it is made; (3) furnishes an Earnings Claim statement to prospective purchasers in conjunction with the disclosure document, containing, among other things, information regarding the time frame captured by the earnings claim, the characteristics of the purchasers, and the number and percentage of all persons who purchased the business opportunity within the time frame who achieved at least the stated level of earnings; and (4) makes written substantiation of the earnings claim available to any prospective purchaser who requests it. 16 C.F.R. § 437.4(a).

59.     Defendants have also made earnings claims in connection with the sale of their business opportunities in the general media, as defined by the Business Opportunity Rule, 16 C.F.R. § 437.1(h). Under the Business Opportunity Rule, "general media" means "any instrumentality through which a person may communicate with the public, including, but not limited to, television, radio, print, Internet, billboard, Web site, commercial bulk email, and mobile communications." 16 C.F.R. § 437.1(h).

60.     The Business Opportunity Rule prohibits sellers from making earnings claims in the general media unless the seller has a reasonable basis for and written substantiation of any

17

earning claims and states in immediate conjunction with those claims the beginning and ending

dates when the represented earnings were achieved, and the number and percentage of all

persons who purchased Defendants' business opportunity prior to that ending date who achieved

at least the stated level of earnings. 16 C.F.R § 437.4(b).

61.     Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of

the Business Opportunity Rule constitutes and unfair or deceptive act or practice in or affecting

commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

### Misrepresentations Regarding Income or Profits

62.     In numerous instances in connection with the offer for sale, sale, or promotion of

business opportunities, Defendants have misrepresented the amount of sales, or gross or net

income or profits, a prospective purchaser may earn or that prior purchasers have earned.

63.     Therefore, Defendants acts and practices, as described in paragraph 60, violated

the Business Opportunity Rule, 16 C.F.R. § 437.6(d), and Section 5(a) of the FTC Act, 15 U.S.C.

§ 45(a).

## COUNT III

### Earnings Claims to Prospective Purchasers Violations

64.     In numerous instances in connection with the offer for sale, sale, or promotion of

business opportunities, Defendants have made earnings claims to prospective purchasers while,

among other things: (1) lacking a reasonable basis for the earnings claim at the time it was made,

(2) lacking written substantiation for the earnings claim at the time it was made, and (3) failing to

provide an earnings claim statement to prospective purchasers as required by the Business

Opportunity Rule.

65.     Therefore, Defendants' acts and practices, as described in paragraph 62 above,

18

violated the Business Opportunity Rule, 16 C.F.R. § 437.4(a), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IV

### Disclosure Document Violations

66.    In numerous instances in connection with the offer for sale, sale, or promotion of business opportunities, Defendants have failed to furnish prospective purchasers with a disclosure document and any required attachments within the time period prescribed by the Business Opportunity Rule.

67.    Therefore, Defendants' acts and practices, as described in paragraphs 64 above violated the Business Opportunity Rule, 16 C.F.R. §§ 437.2 and 437.3(a), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE CONSUMER REVIEW FAIRNESS ACT

68.    The CRFA defines "covered communication" as "a written, oral, or pictorial review, performance assessment of, or other similar analysis of, including by electronic means, the goods, services, or conduct of a person by an individual who is party to a form contract with respect to which such person is a party." 15 U.S.C. § 45b(a)(2).

69.    The CRFA defines "form contract" to mean "a contract with standardized terms (i) used by a person in the course of selling or leasing the person's goods or services; and (ii) imposed on an individual without a meaningful opportunity for such individual to negotiate the standardized terms." 15 U.S.C. § 45b(a)(3).

70.    Subsection (b) of the CRFA renders void any provision of a form contract if such provision prohibits or restricts the ability of an individual who is a party to the form contract to engage in a covered communication. 15 U.S.C. § 45b(b)(1).

71.    The CRFA prohibits any person from offering a form contract containing a

19

provision described as void in subsection (b) of the CRFA. 15 U.S.C. § 45b(c).

72.    Pursuant to the CRFA, a violation of subsection (c) of the CRFA shall be treated as a violation of a rule defining an unfair or deceptive act or practice prescribed under Section 18(a)(1)(B) of the FTC Act, 15 U.S.C. § 57a(a)(1)(b), and the FTC shall enforce the CRFA in the same manner, by the same means, and with the same jurisdiction, powers, and duties as the FTC Act. 15 U.S.C. § 45b(d).

73.    Defendants have offered form contracts, as that term is defined in the CRFA. 15 U.S.C. § 45b(a)(3).

## COUNT V

### Violations of the CRFA

74.    In numerous instances, as described in paragraphs 3, 9, and 43 to 46, Defendants have offered, in the course of selling their business opportunities, form contracts containing provisions that prohibit or restrict the ability of an individual who is a party to the form contract to engage in a covered communication.

75.    Defendants have thereby violated the CRFA, 15 U.S.C. § 45b(c).

## CONSUMER INJURY

76.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the Business Opportunity Rule, and the CRFA. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, the FTC requests that the Court:

A.    Enter a permanent injunction to prevent future violations of the FTC Act, the Business Opportunity Rule, and the CRFA by Defendants.

20

B.      Grant preliminary injunctive and ancillary relief as may be necessary to avert the

likelihood of consumer injury during the pendency of this action and to preserve the possibility

of effective final relief, including a preliminary injunction, an order freezing assets, and the

appointment of a receiver.

C.      Award monetary and other relief within the Court's power to grant.

D.      Award any additional relief as the Court determines to be just and proper.

Respectfully submitted,

Dated: September 18, 2024                 /s/Amanda Grier

Amanda Grier (DC Bar No. 978573)
Ryan McAuliffe (MD Bar No. 2012170072)
Federal Trade Commission
600 Pennsylvania Avenue, NW, CC-8543
Washington, DC 20580
(202) 326-3745; agrier@ftc.gov
(202) 326-3044; rmcauliffe@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

21

RECEIVED

NOV 1 3 2024

CLERK
U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | |
| | **Case No.** |
| **EMPIRE HOLDINGS GROUP LLC d/b/a ECOMMERCE EMPIRE BUILDERS d/b/a STOREFUNNELS. NET and PETER PRUSINOWSKI,** | |
| **Defendants.** | |

## NOTICE OF FILING OF COMPLAINT AND STIPULATED PRELIMINARY INJUNCTION PURSUANT TO 28 U.S.C. § 754

By and Order of the United States District Court for the Eastern District of

Pennsylvania, in the matter captioned *FTC v. Empire Holdings Group LLC. et al.*,

No. 2:24-cv-04949-WB (E.D. Pa.), entered on November 8, 2024, I, Kevin Dooley

Kent, was appointed the receiver (the "Receiver") of all assets and properties of

Empire Holdings Group LLC, Star Active Sports LLC, Empire Partner Network

LLC, Atlas Fund Limited Partnership, Atlas Fund Trust, and Atlas Fund Land Trust.

Pursuant to 28 U.S.C. § 754, the Receiver hereby files copies of (a) the Complaint

filed on September 18, 2024 (excluding attachments pertaining to the *Ex Parte*

Motion for a Temporary Restraining Order) and (b) the November 8, 2024 Stipulated

Preliminary Injunction attached hereto as Exhibits "A" and "B," respectively, for the



purpose of vesting the Receiver with jurisdiction and control over all such property located within this District, with the right to take possession thereof.

Respectfully Submitted,

Dated: November 12, 2024

Kevin Dooley Kent, Receiver

*Pro se*

 **Clark Hill**   **RECEIVED**

Kevin Dooley Kent
T (215) 640-8531
Email:kkent@clarkhill.com

NOV **1 3** 2024

CLERK
**U.S. DISTRICT COURT**

Clark Hill
Two Commerce Square
2001 Market Street, Suite 2620
Philadelphia, PA 19103
T (215) 640-8500
F (215) 640-8501

November 12, 2024

Clerk of Court
USDC FOR DISTRICT OF NEBRASKA
111 South 18th Plaza
Suite 1152
Omaha, NE  68102

      **RE:**    *FTC v. Empire Holdings Group LLC et al.*, **No. 2:24-cv-04949-WB (E.D. Pa.)**

To the Clerk of Court:

       Enclosed for filing pursuant to 28 U.S.C. § 754 is a Notice of Filing of Complaint and Order Appointing Receiver, that has been entered in the United States District Court for the Eastern District of Pennsylvania. Federal statute requires that I file notice of my appointment as Receiver in any jurisdiction where assets potentially belonging to the receivership may reside. Therefore, enclosed for filing please find:

- Civil Cover Sheet (Form JS 44);

- Notice of the Filing of Complaint and Stipulated Preliminary Injunction pursuant to 28 U.S.C. § 754, with Complaint (without attachments) and Stipulated Preliminary Injunction attached as exhibits;

- Copy of the Notice of the Filing of Complaint and Stipulated Preliminary Injunction pursuant to 28 U.S.C. § 754, without exhibits, to be stamped and returned;

- A self-addressed stamped envelope for return copy; and

- A check for $52.00, the standard Miscellaneous filing fee.

       Please return to me a copy of the date-stamped Notice in the enclosed envelope once it has been assigned a miscellaneous docket number. Please do not hesitate to contact me if you have any questions regarding this filing. Your attention to this matter is greatly appreciated.

               Very truly yours,

               Kevin Dooley Kent, Receiver

KDK/Encs.

# EXHIBIT A

# EXHIBIT B



Reusable E

I'm recyclable





TO REUSE: Mark through all previous shipping labels and barcode

ORIGIN ID:MUVA    (215) 849-8500
KEVIN KENT
CLARK HILL
TWO COMMERCE SQUARE
2001 MARKET ST, SUITE 2620
PHILADELPHIA, PA 19103
UNITED STATES US

SHIP DATE: 26SEP24
ACTWGT: 8.59 LB
CAD: 25378673/INET0600

BILL SENDER

TO  CLERK OF COURT
    USDC - DISTRICT OF NEBRASKA
    111 SOUTH 18TH PLAZA
    SUITE 1152
    OMAHA NE 68102
(215) 309-1081    REP: 655CD.5186
INV:
PO:                    DEPT:

FedEx                          WED - 13 NOV 5:00P
TRK#  2796 9112 7076    STANDARD OVERNIGHT
| 0201

XX AIAA                            68102
                              NE-US  OMA